# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THEODORE BURNS, | Civil Action No. 12 – 239 |
| Plaintiff, | |
| v. | Chief Magistrate Judge Lisa Pupo Lenihan |
| MARSHALL FIKE, *C/O 1*, ANDREW SCHNEIDER, *C/O 1*, and JOHN CONNOR, *C/O 1*, | ECF No. 44 |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

This case is before the Court on the Motion for Summary Judgment filed by Defendants, Corrections Officers at the State Correctional Institution at Greene ("SCI-Greene"): C/O Marshall Fike, C/O Andrew Schneider, and C/O John Connor. Among the arguments Defendants make in support of summary judgment is that Plaintiff did not properly exhaust his administrative remedies as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a), and has thus procedurally defaulted his claims. For the reasons set forth in this Memorandum, Defendants' Motion for Summary Judgment will be granted on this ground.

## I. FACTUAL BACKGROUND

Plaintiff's claims arise out of an incident that occurred at 5:20 a.m. on November 21, 2010, while he was walking to his assigned job in the Dietary Department. (Plaintiff's Second Amended Complaint, ECF No. 21 at ¶ 10.) As Plaintiff was approaching the entrance to the kitchen, he was suddenly attacked by another inmate and repeatedly hit in the head with a

1

combination lock attached to a homemade rope made from torn sheets. Id. at ¶ 11. It is undisputed that the assault, which lasted approximately two minutes, was witnessed by the Defendant officers and that the officers did not intervene to end the assault. What is disputed, however, is whether they had a duty to intervene and their actions while the assault was taking place.

According to Plaintiff, the Defendants were approximately five to eight feet away from the assault and simply watched while the attacker repeatedly struck him in the head with the weapon, knocking him to the ground. Id. at ¶¶ 12-13, 16. One officer even allegedly yelled, "Get up, be a man and fight back." Id. at ¶ 15. Several inmates who were in the kitchen dining area started to bang on the window and shout for the guards to stop the attacker. Id. at ¶ 17. After repeatedly striking Plaintiff with the lock, Mr. Wyne, a civilian kitchen worker, rushed outside to the scene and subdued and disarmed the attacker without any help from the Defendants. Id. at ¶ 18. Afterward, Plaintiff received treatment for his injuries, which included numerous lacerations to his head. Id. at ¶ 19.

Defendants paint a different picture of what happened that morning. According to Defendant Conner, who was responsible for escorting a group of approximately 20 inmates, including Plaintiff, from B-Blck to the kitchen, he witnessed a "skirmish" between Plaintiff and his attacker. (Def.'s Exh. 10, Declaration of John Conner, ECF No. 47-10 at ¶¶ 4-5.) He was approximately thirty feet away and he heard Defendants Schneider and Fike order the assaulting inmate to stop. Id. at ¶¶ 5-6. He also heard a notification over the radio that there was a fight. Id. at ¶ 6. He claims that he could not intervene because he could not allow for the other inmates, who were still walking in front of him, to be left unsupervised. Id. at ¶ 7. He also claims that he could not place himself in front of the inmates because that would have impaired

his ability to control them and jeopardized his safety as well as the safety of the other inmates. Id. He states that Mr. Wyne did not subdue the attacker as Plaintiff alleges and that before backup arrived the attacker finally complied with Defendants Fike and Schneider's orders to stop. Then the attacker was handcuffed. Id. at ¶¶ 8-9. He denies stating, or ever hearing an officer state, "Get up and fight like a man." Id. at ¶ 11.

Defendant Fike states that he was assigned to work as a Shift Sergeant that morning, and, around 5:20 a.m., when the group of inmates were being escorted to the kitchen to report for work, he heard a "loud thump and immediately looked in the direction of the noise" where he observed the attack on Plaintiff. (Def.'s Exh. 1, Declaration of Marshall Fike, ECF No. 47-1 at ¶¶ 4-5.) As soon as he saw what was happening, he repeatedly ordered the attacker to stop and drop the weapon. Id. at ¶ 6. The attacker did not immediately comply with his orders so he radioed for back up while ordering everyone in the vicinity to back away. Id. He states that he did not intervene in the assault because the attacker was swinging a lock affixed to a rope and had he intervened he would have put himself in harm's way. Id. at ¶ 7. He also states that Mr. Wyne did not subdue the assailant and that the inmate eventually tossed the weapon toward him and put his hands in the air. Id. at ¶¶ 8-9. The attacker complied with orders to lie face down on the ground at which time Defendant Schneider placed handcuffs on him and patted him down. Id. at ¶ 9. He also denies ever stating, or hearing anyone state, "Get up and fight like a man." Id. at ¶ 11.

Defendant Schneider's recitation of events correlates with Defendant Fike's version except for the fact that he claims he did not intervene because he feared that he would have gotten hurt or "knocked out" and that had he intervened Defendant Fike would have been on his own until the other officers responded. (Def.'s Exh. 2, Declaration of Andrew Schneider, ECF

No. 47-2 at ¶¶ 1-7.) He also denies ever stating, or hearing anyone state, "Get up and fight like a man." Id. at ¶ 8.

The incident reports prepared by Defendants Schneider and Fike indicate that control was notified of the assault at 5:20 a.m. and that Lt. Bowlin arrived on the scene two minutes later, at which time the attacker dropped the weapon. (Def.'s Exhs. 4-5, Employee Report of Incident by Schneider and Mike, ECF Nos. 47-4, 47-5.) A nurse arrived on scene at 5:25 a.m. to tend to Plaintiff's injuries and take him to the medical department for treatment, via wheelchair. Id.; ECF No. 47-1 at ¶ 10. The medical incident/injury report indicates that Plaintiff had a one-and-a-quarter inch laceration on the right side of his forehead and multiple one-half to one inch lacerations on the back of his head. (Def.'s Exh. 7, Medical Incident/Injury Report, ECF No. 47-7 at p.1.) Upon evaluation, Plaintiff denied vision and hearing problems and loss of consciousness. Id. at p.1. It was noted that his conversation was appropriate and that he could ambulate independently. Id. There was moderate bleeding to all areas, which was controlled by pressure and bandages. Id. Plaintiff received stitches for three of his lacerations and was kept in the infirmary for further evaluation. Id. at p.4. He was evaluated by the nurses on multiple occasions throughout the day and complained of having a slight headache and some pain, for which he was given Tylenol 500mg. Id. at pp. 5-7. He was discharged back to his block the following afternoon and his stitches were removed on November 29, 2010. Id. at p.8.

## II. EXHAUSTION OF ADMINISTRATIVE REMEDIES

Through the Prison Litigation Reform Act ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), Congress amended 42 U.S.C. § 1997e(a) to prohibit prisoners from bringing an action with respect to prison conditions pursuant to 42 U.S.C. § 1983 or any other federal law,

until such administrative remedies as are available are exhausted. Specifically, the act provides, in pertinent part, as follows:

> No action shall be brought with respect to prison conditions under section 1979 of the Revised Statutes of the United States (42 U.S.C. § 1983), or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). Exhaustion is required under this provision regardless of the type of relief sought and the type of relief available through administrative procedures. *See* Booth v. Churner, 532 U.S. 731, 741 (2001). In addition, the exhaustion requirement applies to all claims relating to prison life which do not implicate the duration of the prisoner's sentence, including those that involve general circumstances as well as particular episodes. *See* Porter v. Nussle, 524 U.S. 516, 532 (2002). Federal courts are barred from hearing a claim if a plaintiff has failed to exhaust all the available remedies prior to filing the action. *See* Nyhuis v. Reno, 204 F.3d 65, 73 (3d Cir. 2000) (by using language "no action shall be brought," Congress has "clearly required exhaustion").

The PLRA also mandates that inmates "properly" exhaust administrative remedies before filing suit in federal court. Woodford v. Ngo, 548 U.S. 81, 93 (2006). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjunctive system can function effectively without imposing some orderly structure on the course of its proceedings." *Id*. at 90-91. Such requirements "eliminate unwarranted federal-court interference with the administration of prisons, and thus seek[] to 'affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.'" *Id*. at 93 (quoting Porter, 534 U.S. at 525). Importantly, the exhaustion requirement may not be satisfied "by filing an untimely or otherwise procedurally defective . . .

5

appeal." Id. at 83; *see also* Spruill v. Gillis, 372 F.3d 218, 228-29 (3d Cir. 2004) (utilizing a procedural default analysis to reach the same conclusion). Courts have concluded that inmates who fail to fully, or timely, complete the prison grievance process are barred from subsequently litigating claims in federal courts. *See*, *e.g.*, Booth v. Churner, 206 F.3d 289 (3d Cir. 2000); Bolla v. Strickland, 304 F. App'x 22 (3d Cir. 2008); Jetter v. Beard, 183 F. App'x 178 (3d Cir. 2006).

This broad rule favoring full exhaustion admits of one, narrowly defined exception. If the actions of prison officials directly caused the inmate's procedural default on a grievance, the inmate will not be held to strict compliance with this exhaustion requirement. *See* Camp v. Brennan, 219 F.3d 279 (3d Cir. 2000) (Section 1997e(a) only requires that prisoners exhaust such administrative remedies "as are available"). However, case law recognizes a clear "reluctance to invoke equitable reasons to excuse [an inmate's] failure to exhaust as the statute requires." Davis v. Warman, 49 F. App'x 365, 368 (3d Cir. 2002). Thus, an inmate's failure to exhaust will only be excused "under certain limited circumstances," Harris v. Armstrong, 149 F. App'x 58, 59 (3d Cir. 2005), and an inmate can defeat a claim of failure to exhaust only by showing "he was misled or that there was some extraordinary reason he was prevented from complying with the statutory mandate." Davis, 49 F. App'x at 368; *see also* Brown v. Croak, 312 F.3d 109, 110 (3d Cir. 2002) (assuming that prisoner with failure to protect claim is entitled to rely on instruction by prison officials to wait for outcome of internal security investigation before filing grievance); Camp, 219 F.3d at 281 (exhaustion requirement met where Office of Professional Responsibility fully examined merits of excessive force claim and correctional officers impeded filing of grievance).

In the absence of competent proof that an inmate was misled by corrections officials, or some other extraordinary circumstances, inmate requests to excuse a failure to exhaust are frequently rebuffed by the courts. Thus, an inmate cannot excuse a failure to timely comply with these grievance procedures by simply claiming that his efforts constituted "substantial compliance" with this statutory exhaustion requirement. Harris, 149 F. App'x at 59. Nor can an inmate avoid this exhaustion requirement by merely alleging that the Department of Corrections policies were not clearly explained to him. Davis, 49 F. App'x at 368. Thus, an inmate's confusion regarding these grievances procedures does not, standing alone, excuse a failure to exhaust. Casey v. Smith, 71 F. App'x 916 (3d Cir. 2003). Moreover, an inmate cannot cite to alleged staff impediments to grieving a matter as grounds for excusing a failure to exhaust, if it also appears that the prisoner did not pursue a proper grievance once those impediments were removed. Oliver v. Moore, 145 F. App'x 731 (3d Cir. 2005) (failure to exhaust not excused if, after staff allegedly ceased efforts to impede grievance, prisoner failed to follow through on grievance).

## III. DISCUSSION

The Pennsylvania Department of Corrections grievance procedure, contained in DC-ADM 804, is a three-step Inmate Grievance System that provides inmates with an avenue to seek review of problems that may arise during the course of their confinement. Pursuant to DC-ADM 804, the Inmate Grievance System Procedure, after an attempt to resolve any problems informally, an inmate may submit a written grievance to the facility's Grievance Coordinator for initial review. This must occur within fifteen working days after the events upon which the claims are based. Within fifteen working days of an adverse decision by the Grievance

Coordinator, an inmate may then appeal to the Facility Manager of the institution.[1] Within fifteen working days of an adverse decision by the Facility Manager, an inmate may file a final appeal to the Secretary's Office of Inmate Grievances and Appeals ("SOIGA"). An appeal to final review cannot be completed unless an inmate complies with all established procedures. An inmate must exhaust all three levels of review and comply with all procedural requirements of the grievance review process in order to fully exhaust an issue. *See* Booth v. Churner, 206 F.3d 289, 293 n.2 (3d Cir. 2000) (outlining Pennsylvania's grievance review process); Ingram v. SCI Camp Hill, No. 08-23, 2010 U.S. Dist. LEXIS 127124, at *21-25 (M.D. Pa. Dec. 1, 2010) (same).

Defendants maintain that Plaintiff did not properly exhaust his administrative remedies pursuant to the PLRA because his initial grievance, while dated December 8, 2010, was not received by the Grievance Coordinator until one week later, on December 15, 2010, which was outside of the required timeframe of 15 working days. (Def.'s Exh. 3, Plaintiff's Grievance #346961, ECF No. 47-3 at p.2.) Plaintiff's grievance was rejected on December 15, 2010, due to his failure to timely submit the grievance. Id. at p.3. Plaintiff appealed the rejection of the grievance to the Superintendent on December 17, 2010, and the Superintendent issued an appeal response on December 30, 2010, upholding the initial rejection of Plaintiff's grievance as being untimely. Id. at pp.4-5. Plaintiff's appeal to the SOIGA was received on April 12, 2011. Id. at p.6. On April 18, 2011, a final appeal decision was rendered by the SOIGA, dismissing Plaintiff's appeal at the final appeal level for being untimely. Id. at p.7.

---

[1] The policy was last amended on December 1, 2010. The previous version of the policy only allowed ten working days to appeal an adverse initial review decision to the facility manager.

In response, Plaintiff states that the Grievance Coordinator miscalculated the timeliness of his grievance and that his grievance was actually submitted within eleven working days following the incident. Although unclear, it appears he argues that the earliest date in which he could submit his grievance was November 24, 2010, because he was held in the RHU for three days following the incident pending an investigation. From the Court's calculation that would be eleven working days before December 8, 2010, the date that he signed his grievance, but sixteen days before his grievance was actually received. Plaintiff further asserts that the "mailbox rule" annunciated in Houston v. Lack, 487 U.S. 266 (1998), is applicable or should be extended to apply to the submission of his grievance to prison officials. Pursuant to the "mailbox rule," an inmate is deemed to have filed a pleading in state or federal court on the date that he placed his pleading into the prison mailing system, not on the date that it was ultimately received and filed by the clerk of the applicable court. Id. at 276. This Court has found no other court that has applied this rule to the submission of inmate grievances or appeals during the grievance procedure. Rather, as stated above, proper exhaustion under the PLRA mandates compliance with the prison's deadlines and other procedural rules. Woodford, 548 U.S. at 90-93. The Pennsylvania Department of Corrections Inmate Grievance System Procedures Manual specifically states that an "inmate must *submit* a grievance for Initial Review to the Facility Grievance Coordinator within 15 working days after the event upon which the claim is based." DC-ADM 804, Sect. 1(A)(14) (emphasis added). There is nothing in the manual which allows for the application of the prisoner mailbox rule to the submission of grievances in the context in which Plaintiff contends.

Furthermore, the Court notes that Plaintiff's final appeal to SOIGA was not submitted until April 2011 (received on April 12, 2011) even though the Superintendent's appeal response

was rendered on December 30, 2010. Pursuant to the grievance procedure, Plaintiff had only fifteen working days to submit his appeal to SOIGA. In his appeal letter to SOIGA Plaintiff stated that the reason for the "delay" in filing the appeal was because he was in the RHU from December 23, 2010, until March 23, 2011, and "did not have my copy of this and could not respond to the decision of the Superintendent. I had wrote to him on 12/7/2010 and did not get a response from him until Jan. 6 2011." While Plaintiff actually submitted his appeal to the Superintendent on December 17, 2010, and not December 7, 2010, it is unclear what the "this" is referring to in his explanation. It appears to the Court that the "this" was the Superintendent's appeal response but Plaintiff stated that he received it on January 6, 2011. Regardless, he does not explain why he waited until April to file his appeal to SOIGA or why he was prohibited from filing his appeal while in the RHU.[2] His final appeal was dismissed as untimely on April 18, 2011.

The PLRA mandates that inmates "properly" exhaust their administrative remedies before filing suit in federal court and that demands compliance with an agency's deadlines and procedural rules. Woodford, 548 U.S. at 90-93. It is clear from the record that Plaintiff did not do so in this case. Not only was his initial grievance untimely, but his final appeal was untimely as well. We sympathize that Plaintiff was attacked by another inmate apparently unexpectedly and unprovoked. In addition, we recognize that under certain circumstances, administrative remedies may not be effectively "available," preventing a timely pursuit of the prison grievance process. See, e.g., Brown v. Croak, 312 F.3d 109, 112 (3d Cir. 2002) (administrative remedy unavailable where prison security officials told inmate to wait to file grievance until after the

---

[2] The Court notes that inmates in the RHU are allowed to file grievances. Per Pennsylvania DOC policy, grievance forms are "readily available on every housing unit." DC-ADM 804, Sect. 1(A)(6). Even if Plaintiff was on "grievance restriction," he would still be allowed to file "one grievance every 15 working days." Id. at Sect.1(C)(1).

investigation was complete); Camp v. Brennan, 219 F.3d 279, 281 (3d Cir. 2000) (administrative remedy unavailable where inmate put on grievance restriction). However, in this case, the record simply does not support a finding that the administrative process was unavailable to him. Even assuming Plaintiff was told to wait to file a grievance until after the investigation concluded, which no such allegation was even made in this case, his initial grievance was still untimely submitted by one day because the first day he presumably could have filed his grievance was the day he was released from the RHU, which, according to Plaintiff, was November 24, 2010.[3] Thus, the Court finds that Defendants are entitled to summary judgment because Plaintiff did not properly exhaust his administrative remedies pursuant to the PLRA. An appropriate order follows.

**AND NOW**, this 31st day of October, 2013;

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (ECF No. 44) is granted on the ground that Plaintiff did not properly exhaust his administrative remedies pursuant to the PLRA before filing suit.

**IT IS FURTHER ORDERED** that the Clerk of Court mark this case **CLOSED**.

**AND IT IS FURTHER ORDERED** that pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure, Petitioner has thirty (30) days to file a notice of appeal as provided by Rule 3 of the Federal Rules of Appellate Procedure.

---

[3] The only evidence of record regarding any investigation that took place are four Employee Incident Reports each dated November 21, 2010, the day of the incident, and two Extraordinary Occurrence Reports, one dated November 21, 2010, and the other dated November 22, 2010, approved on November 23, 2010. (ECF Nos. 47-4, 5, 6, 8A, 8B, 9.) There is no evidence that Plaintiff was housed in the RHU during this time or that he was told to wait to file a grievance until the investigation had concluded. Moreover, Plaintiff's medical records indicate that he was "discharged to F Block as ordered" on November 22, 2010. (ECF No. 47-4 at p.7.)

/s/ Lisa Pupo Lenihan

Lisa Pupo Lenihan
Chief United States Magistrate Judge

cc: **Theodore Burns**
BY-9150
SCI Greene
175 Progress Drive
Waynesburg, PA 15370
*Via First Class U.S. Mail*

Counsel of Record
*Via ECF Electronic Mail*